**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

DANIEL HUZINEC,

               Defendant.

Case No. 1:15-cr-28
           (LJV)

February 15, 2018

_____


**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**


<u>APPEARANCES:</u>        JAMES P. KENNEDY, JR.
                      ACTING UNITED STATES ATTORNEY
                      BY: STEPHANIE O. LAMARQUE, ESQ.
                      Assistant United States Attorney
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York 14202
                      For the Plaintiff

                      HARRINGTON AND MAHONEY
                      BY: JAMES P. HARRINGTON, ESQ.
                      70 Niagara Street
                      Third Floor
                      Buffalo, New York 14202
                      For the Defendant

<u>PROBATION:</u>         LINDSAY M. MAZA, USPO
                      MATTHEW G. ZENGER, USPO

<u>DEPUTY CLERK:</u>     ALLISON P. GIOIA, ESQ.

<u>COURT REPORTER:</u>   ANN M. SAWYER, RPR, CRR, NYRCR, NYACR
                        Notary Public
                      Robert H. Jackson Courthouse
                      2 Niagara Square
                      Buffalo, New York 14202
                      Ann_Sawyer@nywd.uscourts.gov

1          (Proceedings commenced at 10:01 a.m.)

2          THE CLERK:  All rise.  United States District Court

3   for the Western District of New York is now in session, the

4   Honorable Lawrence J. Vilardo presiding.

5          THE COURT:  Please be seated.

6          THE CLERK:  15-CR-28, United States of America versus

7   Daniel Huzinec.

8          Assistant United States Attorney Stephanie O.

9   Lamarque appearing on behalf of the government.

10          Attorney James P. Harrington appearing with the

11   defendant.  The defendant is present.

12          Also present, United States probation officers

13   Lindsay M. Maza and Matthew G. Zenger.

14          This is the date set for sentencing.

15          THE COURT:  Good morning, everyone.

16          ALL PARTIES:  Good morning, Your Honor.

17          THE COURT:  Mr. Huzinec is before the Court for

18   sentencing on his previous plea of guilty to Count 2 of the

19   superseding indictment, and that charged that he received

20   child pornography in violation of Title 18, United States

21   Code, Section 2252A(a)(2)(A).

22          I note that Mr. Huzinec, in paragraph 9 of the plea

23   agreement, agreed with the government that pursuant to

24   sentencing guidelines Section 1B1.2(a), his sentencing range

25   for imprisonment will be determined based as if he were

1  convicted of two counts of violating production of child

2  pornography pursuant to Title 18, United States Code,

3  Section 2251(a).

4  So we'll begin with some questions that I have for

5  the attorneys and for you, Mr. Huzinec, about the presentence

6  investigation report.

7  I'm then going to make sure that I've received and

8  read everyone's sentencing-related submissions, including the

9  many letters that were written on your behalf.

10  After that, I'm going to hear from counsel regarding

11  the objections to the presentence report.  I'm then going to

12  make some factual findings, and I will calculate the

13  applicable guidelines sentence range.  I'm going to rule on

14  the government's motion for sentencing-related relief, and

15  before I state the sentence I'm going to give the attorneys

16  and you a chance to address me to bring up anything that you

17  think is relevant to sentencing.

18  Are there any questions before we begin from the

19  government?

20  MS. LAMARQUE:  No, Your Honor.

21  THE COURT:  From the defense?

22  MR. HARRINGTON:  No, sir.

23  THE COURT:  Okay.  So, Mr. Harrington, have you had

24  enough time to read the presentence report prepared on

25  February 28th, 2017, revised on April 12th, 2017, and revised

1    again on February 1st, 2018, and to review it with your

2    client?

3           MR. HARRINGTON:  Yes, Judge.

4           THE COURT:  And, Ms. Maza, do I have the dates

5    correct?

6           USPO MAZA:  That's correct, Judge.

7           THE COURT:  And the last revision was February 1st,

8    2018, right?

9           USPO MAZA:  That's correct, Judge.

10           THE COURT:  All right.  Thank you.

11           Mr. Harrington, did you explain the contents of the

12    report to Mr. Huzinec?

13           MR. HARRINGTON:  Yes, Judge.

14           THE COURT:  Do you have any concerns about his

15    ability to understand it?

16           MR. HARRINGTON:  No.

17           THE COURT:  Mr. Huzinec, did you receive a copy of

18    the report that was first prepared on February 28th of last

19    year and then revised on April 12th and revised again on

20    February 1st of this year?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Did your attorney explain it to you?

23           THE DEFENDANT:  Yep.

24           THE COURT:  Do you understand it?

25           THE DEFENDANT:  Um-hum.

1          THE COURT:  You have to answer "yes" or "no."

2          THE DEFENDANT:  Yes, I do.  Sorry.

3          THE COURT:  Do you have any questions about it now?

4          THE DEFENDANT:  No.

5          THE COURT:  Mr. Harrington, in the defendant's

6   sentencing statement and the objections, you've raised what I

7   count to be five objections to four paragraphs in the

8   presentence report.  Those paragraphs are:  Paragraph 37, the

9   last sentence of paragraph 15, two issues in paragraph 73, and

10  paragraph 82.

11          We're going to get to those objections in a minute,

12  but before we do, let me ask:  Other than those objections, do

13  you want to contest or change anything in the presentence

14  report?

15          MR. HARRINGTON:  No, sir.

16          THE COURT:  And that includes both the facts and the

17  guidelines calculation; is that right?

18          MR. HARRINGTON:  Correct.

19          THE COURT:  Okay.  So you adopt the presentence

20  report except for those objections?

21          MR. HARRINGTON:  I don't know if "adopt" is the right

22  word.  I do not object.

23          THE COURT:  Okay.  Fine.

24          Mr. Huzinec, other than the objections filed on your

25  behalf by Mr. Harrington, do you want to contest or change

1  anything in the report?

2         THE DEFENDANT:  No.

3         THE COURT:  And, Ms. Lamarque, does the government

4  want to contest or change anything in the report?

5         MS. LAMARQUE:  No, Your Honor.

6         THE COURT:  And that includes both the facts and the

7  guidelines calculation; is that right?

8         MS. LAMARQUE:  That's correct.

9         THE COURT:  Okay.  So, Mr. Harrington, let's talk

10  about submissions.

11         I've received and reviewed the defendant's sentencing

12  statement and objections to the presentence investigation

13  report, the defendant's sentencing memorandum which attaches a

14  number of letters written on Mr. Huzinec's behalf, and those

15  include -- and we'll get to the supplemental memorandum in a

16  second, but the sentencing memorandum includes a number of

17  letters: a letter from Thomas Huzinec, his father; a letter

18  from Gretchen Knott, his mother; Matthew Cardino, his oldest

19  brother; a Christopher Cardino, his next-oldest brother; a

20  letter from James Grande, his uncle; a letter from Maureen

21  Grande, his aunt; a letter from Kevin Grande, his cousin; a

22  letter from David M. Huzinec, his late uncle and godfather; a

23  letter from David W. Huzinec, his cousin; a letter from Emily

24  Huzinec, another cousin; a letter from Teresa Huzinec, his

25  aunt; a letter from Daniel Knott, his uncle; a letter from

1    Donald Knott, his grandfather; a letter from James Mead, his

2    mother's cousin; a letter from Constance Partridge, his great

3    aunt; a letter from Eugene Partridge, his great uncle; a

4    letter from Margaret Roberts, his aunt; a letter from Barbara

5    Kern Suffoletto, who is the wife of his late former scout

6    leader; a letter from Roxanne Anderson, a family friend; a

7    letter from Amelia Heppner, another friend; a letter from

8    Norman Krause, a fellow scout leader; a letter from Joseph

9    Kwiatkowski, a fellow scout; a letter from Mary Terhart, a

10   family friend; Helen Kaney Dempsey, his grandmother's cousin;

11   Nadine Leone, a family friend; Margaret Redmond, a neighbor;

12   Michelle Trzyna, a family friend; and Karra Schultz, a

13   coworker.

14          And then in addition to that, I've received and

15   reviewed the supplemental sentencing memorandum that was filed

16   under seal, and that attached two confidential psychological

17   reports from Dr. Mazur first dated June 30th, 2017, the second

18   date November 20, 2017, and then a letter from the defendant.

19   Is that everything?

20          MR. HARRINGTON:  Yes, Judge.

21          THE COURT:  Okay.  And is there anything else you

22   would like to submit to the Court in writing this morning?

23          MR. HARRINGTON:  No, sir.

24          THE COURT:  Okay.  Ms. Lamarque, I've received the

25   government's statement with respect to sentencing factors; the

1   government's response to the defendant's objections to the

2   presentence report which addresses the defendant's objection

3   to the two-level increase in paragraph 37 of the report and

4   also the objection to paragraph 15, but does not address the

5   other objections; and then the government's sentencing

6   memorandum and the government's motion and supplemental motion

7   for sentencing-related relief; is that everything?

8           MS. LAMARQUE:  That is everything, Your Honor.

9           THE COURT:  And does the government want to submit

10  anything else in writing this morning?

11          MS. LAMARQUE:  No.

12          THE COURT:  So let's talk about the objections.

13          Am I correct that both objections to paragraph 73 and

14  the objection to paragraph 82 of the presentence report have

15  been resolved to your satisfaction?

16          MR. HARRINGTON:  Yes, Judge.

17          THE COURT:  Okay.  So is it fair to say you're

18  withdrawing those three objections?

19          MR. HARRINGTON:  Yes, sir.

20          THE COURT:  Okay.  Let's talk about the remaining

21  objections.  The first objection is to the two-level increase

22  under guidelines Section 2G2.1(b)(5), and that provides that

23  the minor victim was in the custody, care or supervisory

24  control of the defendant at the time of the offense.  So let

25  me hear from the defense first and then from the government on

 1  that objection.

 2         MR. HARRINGTON:  Judge, it might seem that I'm

 3  splitting hairs in this particular argument, but it is

 4  important.  The two levels here is a guideline change of two

 5  years and nine months, it's a significant amount of time.

 6         THE COURT:  I recognize that, and I don't -- even

 7  splitting hairs or not, you've got a job to do for your client

 8  and I want to hear what you have to say.

 9         MR. HARRINGTON:  Right.  But the issue is not whether

10  he was an assistant scoutmaster, not whether he had

11  supervision of the scouts at some time over that weekend or

12  not, the issue was whether he in fact was the custodian, the

13  person who had supervision at the time of the offense.  And as

14  I indicated in the argument that we made, two scoutmasters

15  were there, his father and another man were there, they were

16  the ones that were in charge.  Daniel Huzinec was there to

17  assist during activities of the day.  He was not in charge of

18  their chaperone overnight or anything like that.  And at the

19  time this incident happened, he was not acting as this

20  custodian or supervisor or anything else, that was a

21  responsibility assigned to the other men.

22         And so that absent proof that he was, in fact, their

23  supervisor or custodian at the time that the relevant conduct

24  or the offense happened, he should not be given that two-level

25  increase.

1           THE COURT:  You agree that more than one person can

2    be a supervisor at one time, right?

3           MR. HARRINGTON:  I do.  No question about that.

4           THE COURT:  So why is the line drawn between adult

5    number 2 and adult number 3 rather than between adult number 1

6    and adult number 2, or between adult number 3 and whoever else

7    was there?

8           MR. HARRINGTON:  Because it was not his

9    responsibility at time.  He was not generally in charge of

10   this particular weekend program or anything else.  He was

11   there as an assistant.  Had this happened while he was on a

12   hike with the boys or while he was supervising some activity,

13   I would not raise the objection.  But at this particular time

14   and at this particular place, that was not -- that was not his

15   responsibility.

16          THE COURT:  Okay.  Let me hear from Ms. Lamarque.

17          MS. LAMARQUE:  Your Honor, application note number 5

18   of Section 2G2.1 is to have a broad application and it's to

19   reflect the fact that there are children entrusted to certain

20   caretakers.

21          Now, I've confirmed that, and I think the defendant's

22   letter confirms, that he was a leader within the organization

23   on this -- on the trip in question.  He was responsible for

24   supervising the kids if the other chaperones were not present,

25   they were his responsibility.

1            During the night, if there were any problems, the

2    kids obviously could have gotten up and talked to the

3    defendant about the problems they had.

4            So I believe the application note does apply.  I

5    would ask the Court to apply the two-level enhancement based

6    on this broad application.

7            THE COURT:  Okay.  And would probation like to be

8    heard?

9            USPO MAZA:  Your Honor, we would stand by our

10   position in our addendum.  Thank you.

11           THE COURT:  Anything further, Mr. Harrington?

12           MR. HARRINGTON:  No, Judge.  But I think what

13   Ms. Lamarque just said is true, Mr. Huzinec had

14   responsibilities and custodial responsibilities and

15   supervision responsibilities for these scouts during that

16   weekend.  We don't contest that.  We're not saying that.

17           But that -- at nighttime, there's nothing that shows

18   that he had any responsibility for that.  That was the

19   responsibility of the two men who were in charge of them and

20   had their welfare in their care.

21           THE COURT:  Okay.  As I read the guidelines and the

22   context of the case, the key phrase is custody, care or

23   supervisory control.  And the commentary does note that the

24   subsection B should be applied broadly, and it cites daycare

25   providers and baby-sitters and things along those lines.  And

1    I think Mr. Huzinec's role here was on an overnight camping

2    trip as an assistant scoutmaster.  He says so in his own

3    statements.  He admitted both to law enforcement at the time

4    of his arrest and I think to the probation officer, as well,

5    that he was chaperoning the victim on a Boy Scout camping

6    trip, and also -- or, it wasn't to the pretrial services, it

7    was in a letter written to Ron shortly after his arrest where

8    he talks about his role in this scout troop, talks about his

9    role in the victim's life.

10           He was 23 at the time of these events.  He's an

11   adult.  He's someone in a position of authority, along with

12   the other two adults on the trip.  And I think he shares

13   supervisory control of the scouts throughout the course of the

14   trip.  And I think that we can't parse when he's on a hike

15   with the boys from the time that he's got general supervisory

16   control over them in the evenings or at night.

17           And so for all those reasons, I find that the

18   two-level increase under guidelines Section 2G2.1(b)(5) does

19   apply and I overrule your objection.

20           So let's now talk about your remaining objection to

21   the last line of paragraph 15 of the presentence report.  And

22   I understand that you've not in your objection used the

23   language of that because of the sensitive nature of it, and

24   I'm going to try to avoid doing that, too.  I'll leave it up

25   to your discretion as to how much you need to get into the

1   words and the facts.  But as I understand it, that information

2   involves a statement that law enforcement said the defendant

3   made to them when they interviewed him.  And so I think what

4   we have is a he-said/he-said kind of situation.  Mr. Huzinec,

5   I think, or at least you on behalf of Mr. Huzinec, are denying

6   that he made the statement.  The law enforcement officer who

7   wrote the report says that he said it.

8           So my question to you, Mr. Harrington, is do we need

9   to have a hearing on the issue, because that's the only way

10  that I think that I can resolve the issue that you've raised.

11          And before you answer, let me note that you don't

12  object to paragraph 16, where -- and take a look at it now if

13  you want -- where the defendant admits essentially the same

14  thing and I think in even more direct language than as the

15  sentence that you object to.

16          So my question is, what do you want to do about that

17  in light of paragraph 16 and in light of the issue of having

18  a, you know, the only way to resolve it is a hearing.

19          MR. HARRINGTON:  Judge, I think that that really

20  is -- is my error.  I should have included that with the

21  objection.  I don't know how I did not do that.  But you're

22  right, it does relate to the same thing.

23          THE COURT:  Yeah.  So what do you want to do?

24          MR. HARRINGTON:  And, Judge, I would note that the

25  statement was taken when they came to execute a search warrant

1   in his house under very stressful and trying conditions for

2   him.  And he has not objected to other statements that he

3   made, he has only particularized the one statement which is

4   probably all that I can give the Court to -- to substantiate,

5   anyway, an evaluation of his credibility.

6           But I agree with the Court, it is a he-said/he-said

7   situation.

8           THE COURT:  I mean, we can have a hearing if you

9   want, if you think it's worth having a hearing.

10          MR. HARRINGTON:  Judge, I --

11          THE COURT:  I will say this, I understand that

12  Mr. Huzinec denies saying those things to the officer.  I also

13  understand that the officer says that he said them.

14          MR. HARRINGTON:  Right.

15          THE COURT:  And I -- and I also understand, and I've

16  read Dr. Mazur's report, and -- and I will take all those

17  things into account, the fact that the officer said he said

18  these things, the fact that he denies saying these things, the

19  fact that Dr. Mazur says what he says, I'm going to take all

20  those things into account in sentencing.  So the question

21  is --

22          MR. HARRINGTON:  Right.

23          THE COURT:  -- what do you want to do with respect

24  to --

25          MR. HARRINGTON:  Judge, we --

1          THE COURT:  -- with respect to these statements?

2          MR. HARRINGTON:  I think if we had a hearing, we'd be

3  standing here in the exact same position.  You would have to

4  say I believe the officer or I believe Mr. Huzinec.  And then

5  the question is, you pick one or the other and then we go

6  ahead.  And so it comes down to the issue of is this statement

7  that critical in terms of your making a decision.  It doesn't

8  enhance the guidelines.  It doesn't affect that calculation.

9          THE COURT:  I think that's right.  So that's why I'm

10 asking you, what do you want me to -- you know, I can't say

11 I'm not going to take the statement into account.  I don't see

12 why an officer would make up something like this.  And, as I

13 say, it's in there twice in paragraph 15 and paragraph 16.

14          On the other hand, I understand that Mr. Huzinec is

15 saying that there was some misinterpretation of what he said.

16          MR. HARRINGTON:  Right.

17          THE COURT:  I get that, too.  But I've got no way of

18 weighing who's telling the truth unless I hear them and see

19 them tell me what was said and what wasn't said.

20          MR. HARRINGTON:  Right.

21          THE COURT:  And I'm asking you whether you want a

22 hearing.

23          MR. HARRINGTON:  Okay.  Why don't you give me a

24 minute to talk to him?

25          THE COURT:  Sure.

1      (Off the record at 10:18 a.m.)

2      (Back on the record at 10:18 a.m.)

3           MR. HARRINGTON:  Judge, we'll not request a hearing.

4           THE COURT:  Okay.  So in that light, I'm going to

5    overrule the objection.  I'm going to -- I understand from the

6    report that the officer said that Mr. Huzinec said that, and I

7    accept that as a fact.  I also understand that Mr. Huzinec

8    denies saying that, and I will accept that denial as a fact

9    too.  And I'll factor all those things into the sentence when

10   I do it.

11          But in light of the fact that you're not requesting a

12   hearing, I think that's the best I can do in resolving that.

13          So I think that resolves all your objections,

14   Mr. Harrington; is that right?

15          MR. HARRINGTON:  It does.

16          THE COURT:  Okay.  I've previously accepted the

17   defendant's plea of guilty to Count 2 of the indictment,

18   receipt of child pornography.  And at that time, I deferred

19   acceptance of the plea agreement.  I now accept the terms and

20   conditions of the plea agreement that was signed on

21   January 17th, and the judgement and the sentence will be

22   consistent with it.

23          I note that in the plea agreement, the government

24   agreed to move to dismiss the open counts of the indictment

25   against the defendant.  And so I also make a finding that the

1  charge to which the defendant entered a plea of guilty, that

2  is Count 2, together with the agreement outlined in the plea

3  agreement that the defendant agrees to be sentenced as though

4  he were convicted of two counts of production of child

5  pornography, adequately reflects the seriousness of the actual

6  offense behavior, and that accepting the agreement will not

7  undermine the statutory purposes of sentencing or the

8  guidelines.

9           As I noted, the defendant pled guilty to receiving

10  child pornography and agreed to be sentenced as though he'd

11  been convicted of two counts of production.  The sentence,

12  therefore, will take into account all relevant conduct, so I

13  think the plea is actually consistent with both the guidelines

14  and the statutory purposes of sentencing in Section 3553(a).

15           The government has filed a statement with respect to

16  sentencing factors accepting the probation and pretrial

17  service office's presentence report, and the defendant's

18  sentencing statement and objections does the same except, of

19  course, with respect to those objections on which I've ruled.

20           So based on the parties' submissions and the

21  representations today in Court, the parties, other than the

22  objections, don't dispute the facts contained in the report.

23  I've also reviewed the report.  Based on my review, based on

24  the parties' written submissions, based on the positions taken

25  on the record today and based on my rulings on the objections,

1    I adopt the facts in the report as my findings of fact and I

2    incorporate them into the record.

3           I will now place the February 1st, 2018 presentence

4    investigation report in the record under seal.  If an appeal

5    is filed, counsel on appeal will be given access to the sealed

6    report except that counsel on appeal will not be given access

7    to the recommendations section at the end of the report.

8           So let's turn to the sentencing guidelines which I

9    must calculate and consider as an important part of my

10   determination of a sentence.  And I apologize to everybody for

11   the very technical nature of what's about to follow, but the

12   guidelines themselves and the reasons behind the guidelines

13   make this a necessary step in the process.

14          Based on the parties' submissions and representations

15   today, except for the objections on which I've ruled, there

16   also are no disputes regarding the recommendations in the

17   presentence investigation report as to the applicable sections

18   of the Sentencing Commission's advisory guidelines.

19          As I previously stated in paragraph 9 of the plea

20   agreement, the defendant and the government agree pursuant to

21   guidelines Section 1B1.2(a) that the sentencing range for

22   imprisonment shall be determined as if the defendant were

23   convicted of two counts of violating Title 18, United States

24   Code, Section 2251(a), production of child pornography

25   involving two victims who are referred to as Victim 1 and

 1   Victim 2.

 2          With respect to Count 1, the presentence

 3   investigation report calculates under the 2016 version of the

 4   guidelines manual that Section 2G2.1(a) provides for a base

 5   offense level of 32.

 6          The report then recommends that the offense level be

 7   increased by two levels under Section 2G2.1(b)(1)(B) of the

 8   guidelines because the victim in this case in that count had

 9   attained the age of 12 years but had not yet attained the age

10   of 16 years.  32 plus 2 is 34.  That gets us to a 34.

11          The report then recommends that the offense level be

12   decreased -- be increased, I'm sorry, by another two levels

13   under Section 2G2.1(b)(6)(A) and (b)(1), because the offense

14   involved the knowing misrepresentation of a participant's

15   identity to persuade, induce, entice, coerce or facilitate the

16   travel of a minor to engage in sexually-explicit conduct, and

17   also involved the use of a computer or interactive computer

18   service to solicit participation of a minor in

19   sexually-explicit conduct.  34 plus 2 is 36.  So for Count 1,

20   the adjusted offense level is 36.

21          Turning to Count 2, the report calculates under the

22   2016 version of the guidelines manual that Section 2G2.1(a)

23   provides for a base offense level of 32.

24          The report then recommends that the offense level be

25   increased by two levels because the offense involved the

 1   commission of a sexual act and sexual contact.  32 plus 2 is

 2   34.

 3          The report then recommends that the offense level be

 4   increased by another two levels under Section 2G2.1(b)(5)

 5   because at the time of the offense the defendant was an

 6   assistant scoutmaster and was in supervisory control of a

 7   number of minor Boy Scouts on an overnight trip.  I previously

 8   ruled on this increase and overruled the defendant's objection

 9   to it, and so it applies and brings the offense level to a 36.

10   34 plus 2 is 36.

11          The presentence investigation report then recommends

12   that the offense level be increased by another two levels

13   under Section 3A1.1(b)(1) because the facts demonstrate that

14   at the time of the offense the victim was sleeping and could

15   not resist the defendant's actions and, therefore, was a

16   vulnerable victim.  36 plus 2 is 38.

17          So based on all those calculations, the offense level

18   on Count 2 is 38.

19          The presentence investigation report calculates the

20   multiple count adjustments as follows:  For group 1, that is

21   Count 1, the adjusted offense level is 36, and it's assigned

22   one unit.  For group 2, and that is Count 2, the adjusted

23   offense level is 38, and is assigned one unit.  So that's a

24   total of two units.  And we take the greater of the adjusted

25   offense levels, that is 38, we increase it by the two units

1   and that results in a combined adjusted offense level of 40.

2   38 plus 2 is 40.

3           The presentence investigation report then recommends

4   that the offense level be decreased by two levels under

5   Section 3E1.1(a) of the guidelines because the defendant has

6   accepted responsibility for his conduct.

7           And in its statement with respect to sentencing

8   factors, the government also moved for an additional one-level

9   decrease of the offense level pursuant to Section 3E1.1(b).  I

10  grant that motion by the government.

11          So based on this, the presentence investigation

12  report calculates the defendant's total offense level to be

13  37.  40 minus 3 is 37.

14          And I understand that the only objection that either

15  the government or the defense has to that is the two-level

16  increase for supervisory control; is that correct,

17  Mr. Harrington?

18          MR. HARRINGTON:  Yes, Judge.

19          THE COURT:  You otherwise agree with that

20  calculation?

21          MR. HARRINGTON:  Yes.

22          THE COURT:  And, Ms. Lamarque, you agree with that

23  calculation?

24          MS. LAMARQUE:  I do, Your Honor.

25          THE COURT:  Okay.  The report then calculates that

1  the defendant's criminal history category is 1 based on a

2  criminal history score of zero.

3      Based on my factual findings and based on my legal

4  conclusions with respect to the sentencing guidelines

5  enhancement for supervisory authority, I agree with the

6  report's calculation of both the offense level and the

7  criminal history category.

8      So with a total offense level of 37 and a criminal

9  history category of 1, and prior to considering the

10  government's motion for sentencing-related relief, the

11  presentence investigation report calculates the applicable

12  guidelines range as follows:

13      A sentence of imprisonment of between 210 and 262

14  months, but because the statutory maximum is 240 months, the

15  guidelines range becomes 210 to 240 months; a fine range of

16  between $20,000 and $200,000; a period of supervised release

17  of five years to life; and then there's a mandatory special

18  assessment of $100 that I must impose.

19      I agree with those calculations in the presentence

20  report, as well.

21      The government has moved for sentencing-related

22  relief under Section 5K1.1 of the guidelines.  More

23  specifically, the government has moved for a two level

24  downward departure to an offense level of 35.

25      Based on the information set forth in the

1    government's motion papers and the government's supplemental

2    motion papers which is relevant to a Section 5K1.1 departure,

3    the government's motion is granted.

4            I therefore recalculate the defendant's offense level

5    to be 35 under the guidelines which, with a criminal history

6    category of 1, results in a guidelines range of imprisonment

7    of 168 to 210 months.

8            Mr. Huzinec, under the Supreme Court's decision in

9    United States versus Booker and the 2nd Circuit's decision in

10   United States versus Crosby, the Court must consider the

11   applicable guidelines but it's not bound by them.

12           The Court must also consider the factors that are set

13   forth in 18, United States Code, Section 3553(a), and those

14   factors include: the nature and circumstances of the offense;

15   your history and your characteristics; the need for the

16   sentence to reflect the seriousness of the offense, to promote

17   respect for the law and to provide a fair punishment to you;

18   the need to deter others from committing crimes and to protect

19   the public from your crimes; the need to provide you with

20   educational or vocational training in an attempt to

21   rehabilitate you; the types of sentences that are available;

22   any policy statements that the Sentencing Commission issues;

23   and sentences given to others who committed crimes that are

24   similar to the one to which you pled guilty; and finally, the

25   need for restitution to victims.

1          I plan to take those considerations into account --

2    those factors into account when I pronounce sentence, but

3    before I do that I want to give the attorneys and you a chance

4    to address me to bring up anything you think is relevant to

5    sentencing.

6          So we're going to start with the government.

7    Ms. Lamarque, does the government want to make any remarks?

8          MS. LAMARQUE:  Yes, Your Honor.  And before I do, I

9    just need to make one correction on the record.  I brought

10   this to Mr. Harrington's attention yesterday, and I'm sorry, I

11   just caught it.

12         In the sealed sentencing memorandum filed by the

13   defendant at the second-to-last page, there's a claim that he

14   told law enforcement about obtaining pictures from Victim 1.

15   I think that may be a typo.  In reality, the defendant did not

16   disclose that crime to the agents.  The pictures were

17   discovered during a forensic examination.

18         THE COURT:  Victim 1 was the victim who sent photos

19   of himself to the defendant; is that --

20         MS. LAMARQUE:  That's correct, Your Honor.

21         THE COURT:  Yeah, I'm aware of that.

22         MS. LAMARQUE:  Okay.

23         THE COURT:  I recognize that.

24         MS. LAMARQUE:  Thank you.

25         THE COURT:  Okay.  And it's just been called to my

1   attention that yesterday, late afternoon, we received an email

2   from defense counsel indicating that the original report from

3   Dr. Mazur had not been attached, that it was inadvertently

4   omitted, and we only received the updated reports from

5   Dr. Mazur.  I now have the original report which should be

6   Exhibit A to the supplemental sentencing memorandum.  Do I

7   have that right?

8           MR. HARRINGTON:  Yes, Judge.

9           THE COURT:  Okay.  So I will incorporate that.  We'll

10  take a break after I hear from everyone, I'll take a look at

11  this, and then I'll come back and pronounce sentence.  But

12  this will be included under seal with the defendant's

13  supplemental sentencing memorandum.

14          You have no objection to that?

15          MS. LAMARQUE:  No, Your Honor, the government was in

16  possession of that prior to the sentencing.

17          THE COURT:  Okay.  Thank you.

18          MS. LAMARQUE:  So the government is asking for a

19  guidelines sentence, and I believe the 3553 factors fully

20  support that, Your Honor.  The nature and the circumstances of

21  the offense are obviously reprehensible.  Sexual exploitation

22  of children is unexcusable.  The defendant chose to prey on

23  two boys that knew him and trusted him.

24          And there are several aggravating factors in this

25  case, Your Honor.  I submit that before he was caught, the

1   defendant began targeting young boys who trusted him, and he

2   took active measures so that he wouldn't be found out.

3          With respect to Victim 1, that behavior occurred in

4   November 2014.  He concealed his identity, and he went to

5   great lengths to do so.  He invented a persona of a young

6   girl, he assumed that identity, he found pictures on the

7   internet of a girl, and even created an email to support that

8   lie all while encouraging this boy to send him child

9   pornography which he then saved on his computer.

10          Shortly after that in January 2015, he preyed on

11   Victim 2.  He targeted him at a time when we're most

12   vulnerable, Your Honor, when he was sleeping.  He was trusting

13   that he was safe with his Boy Scout troop on this camping

14   trip.  And as the PSR notes, there was another child in the

15   room, he was fully clothed, but pictures were also taken of

16   that child.  Those boys relied on the defendant as a leader on

17   that trip to protect them, and in turn they actually suffered

18   harm at his hands.

19          I would also note that the defendant was in

20   possession of heinous child pornography that he had

21   downloaded.  It's been described by law enforcement as among

22   the worst that they've seen in this district.  It included

23   infants who were still in diapers being raped or bound.

24          And as Congress has found, people who possess child

25   pornography are the reason that the market for the production

1    continues.  And that's why children continue to be victimized.

2         Now some of the letters submitted characterize these

3    crimes as mistakes or based in immaturity.  These are not

4    mistakes, Your Honor.  And I know that's not the defendant's

5    contention, these are letters submitted on his behalf.  But

6    these crimes are calculated decisions, and the government

7    rejects any suggestion that immaturity would cause someone to

8    sexually abuse children.

9         The character letters and the defendant's own letters

10   highlight his work with the Boy Scout troop and the fact that

11   the defendant was an Eagle Scout.  It's the government's

12   position that his history and characteristics actually weigh

13   in favor of a substantial sentence of imprisonment because of

14   the egregious abuse of trust and deceptive behavior against

15   the victims.  His service as an Eagle Scout is not a

16   mitigating factor in this case, it's actually an aggravating

17   factor because a whole community placed their trust in him to

18   help raise their children.

19        The defendant's letter states that scout law requires

20   that a scout be trustworthy and loyal.  There's nothing

21   honorable or trustworthy about sexually abusing children

22   entrusted to you, or possessing images of babies and young

23   children being raped.

24        As further detailed in the government's papers, the

25   defendant admits that because he was a scout, he was invited

1   to events by parents and scout families.  He was welcomed into

2   their homes, their lives and their families.  And what did he

3   do with that trust?  He used that to take advantage of the

4   children.

5          I can't imagine the trust that it took for these

6   parents to allow their boys to go on an overnight trip without

7   them being present only to have someone exploit your child

8   when they're not in your care.

9          I know the victim's mother has lasting effects.  She

10  now worries about her child going off to college.  She doesn't

11  trust mentors to be alone with her kids.  And I think it's

12  safe to say that the defendant's actions have rocked an entire

13  community.

14         The defendant's letter also speaks fondly of his own

15  time coming up in the Boy Scouts and how much he will miss it.

16  He describes it as being a great support to him, and how being

17  a part of that organization helped him to feel good about

18  himself and helped him to become a leader.

19         He's robbed those victims of those same

20  opportunities, as well as some of the other scouts in the

21  troop of those benefits that he received.

22         As a result of his actions, those minor victims are

23  at a risk of forever associating scouts and scout leaders with

24  the sexual exploitation they suffered at his hands.

25         The negative impact of these crimes on the victims,

1  their families and the community is huge, Judge.  The kids

2  really lost a piece of innocence because of his actions, and

3  they have to live with that forever and they'll carry those

4  scars forever.

5          For all those reasons, as well as the reasons in the

6  government's papers, Your Honor, the government is asking that

7  the Court impose a guidelines sentence of imprisonment along

8  with a substantial period of supervised release.

9          THE COURT:  Thank you, Ms. Lamarque.  Let me ask a

10  couple questions.

11          I received victim impact statements from -- I guess

12  it was Victim 2 and Victim 2's mother.

13          MS. LAMARQUE:  That's correct.

14          THE COURT:  That's all I received; is that correct?

15          MS. LAMARQUE:  Those are the two victim impact

16  statements that we have received, Your Honor.  Victim 1 and

17  his family did not submit a statement.

18          THE COURT:  Okay.  And no one in connection with the

19  pornography that he received and possessed submitted

20  statements; is that right?

21          MS. LAMARQUE:  It's my understanding that no, and as

22  those counts were not included in the counts of convictions,

23  we have not submitted anything additional.

24          THE COURT:  But one of the counts of conviction was

25  receipt of child pornography that involved the pornography

 1   that you were talking about earlier, right?

 2          MS. LAMARQUE:  No, the receipt is with respect to

 3   Victim 1, Your Honor.

 4          THE COURT:  Okay.

 5          MS. LAMARQUE:  I do believe it is proper to consider

 6   the heinous images under 3661.

 7          THE COURT:  Okay.  Any request for restitution?

 8          MS. LAMARQUE:  No.

 9          THE COURT:  Okay.

10          MR. HARRINGTON:  With respect -- I have not seen the

11   victim statements, impact statements.

12          MS. LAMARQUE:  Those should have been sent to you.  I

13   do have copies.  Maybe when we take a break, if you want to --

14          THE COURT:  Well, I'd like to take a break now so

15   that Mr. Harrington can incorporate those into whatever he

16   tells me, so why don't we do that.  That would mean us ending

17   up taking two breaks.  But let's take a break now, but before

18   we do that, let me ask are there any victims present who would

19   like to speak?

20          MS. LAMARQUE:  None of the charged victims for the

21   offense, Your Honor, no.

22          THE COURT:  Okay.  And have all victims entitled to

23   notice been given notice?

24          MS. LAMARQUE:  They have been.

25          THE COURT:  Okay.  So let's take a break.  I'll be

1   back in about ten minutes.  Mr. Harrington, you'll have --

2   they're relatively brief statements, so you'll have time to

3   review them.  And in the meantime, I'll go read Dr. Mazur's

4   original report.  Okay?  Thanks.

5           THE CLERK:  All rise.

6           (Off the record at 10:38 a.m.)

7           (Back on the record at 10:52 a.m.)

8           THE CLERK:  All rise.

9           THE COURT:  Please be seated.  Mr. Harrington, have

10  you had a chance to read the victim impact statements?

11          MR. HARRINGTON:  I have, Judge.

12          THE COURT:  Okay.  So anything further, Ms. Lamarque,

13  from you or from any victims who would like to speak or anyone

14  else?

15          MS. LAMARQUE:  No, Your Honor.

16          THE COURT:  And you said there are no restitution

17  requests?

18          MS. LAMARQUE:  We have not received any.

19          THE COURT:  Okay.  Mr. Harrington, is there anything

20  you would like to say, sir?

21          MR. HARRINGTON:  I would, Judge.

22          Judge, all of us are complicated and all of us have

23  done things that we're ashamed of in our lives, and I think

24  Daniel is up at the top of that right now because of what he

25  is accused of and pled guilty to.  It's certainly very

1   disturbing to everybody including himself as he looks back at

2   what he did.

3          But, and I'm going to address throughout my remarks

4   some of the things that Ms. Lamarque said.  And I think it's

5   unfair to take something good that somebody's done in their

6   life for years and then attempt to take that and say it goes

7   from a mitigator to an aggravator.

8          There's no question about the issue of trust here.

9   There's no question about the fact that he had the trust of

10  these young people in his care.  But there's also no question

11  that he worked for years with people in his care, and there's

12  never been any allegation nor anybody hinting or accusing him

13  of doing anything like he is convicted of now.

14         And, so, the notion apparently that's implied is he's

15  been scheming for years and years to use his position with the

16  scouts or his position at Child and Family Services for his

17  apparent interests or something horrible, and that's just not

18  the case.

19         Judge, in terms of his support system, you can see in

20  the gallery there are people here.  He has his parents, he has

21  relatives, he has friends, some of whom have -- relatives and

22  friends who have flown here to support him and his parents, a

23  friend who has driven here for four hours, and coworkers.  And

24  you don't get that because you are somebody who has done

25  horrible things all of your life.

1        He, in his current condition, I should update the

2    Court on a few things.  He's gained 60 pounds being in the

3    Niagara County jail, and it's a combination of things: one is

4    an awful diet; the second thing is that he's on three

5    different anxiety pills which tend to increase that, and the

6    other is lack of activity.

7        And where he is in the Niagara County jail and where

8    he's been for almost three years is a special block in the old

9    part of the jail.  I don't remember if -- I don't know if in

10   your former career you visited the Niagara County jail, the

11   pods are not too bad, the line cells are terrible.  And in the

12   cell section that he's in, it's for the most troubled inmates

13   that they have.  So he's in with people who have a lot of very

14   difficult problems, mental illness problems and that.  And

15   they don't have television, he hasn't seen television in three

16   years.  He's not complaining about that, but that's -- they

17   don't have access to a microwave to heat up things they buy in

18   the commissary like you can in all the other pods.  They don't

19   have access to programs, they can't go to anger management and

20   other things like that.  They don't have access to church,

21   which is something that is important to him.  And in spite of

22   that, Judge, he has made an effort while he is there to try

23   and help the other people that are with him.  And I made

24   reference in my memorandum to things that he did at Christmas.

25   He told me yesterday he did that at Easter, too, he did Easter

1    eggs for everybody.  And he told me that on Veteran's Day he

2    did things for the men who are there who are veterans.

3            And these -- in this ward, these are -- these are

4    very, very damaged people.  And what he does is appreciated,

5    but it's also an indication of what kind of a person that he

6    is.

7            And, Judge, you gave him a 5K credit for his

8    cooperation, and I want to tell the Court how that came about.

9    I received a letter from him a while ago in which he told me

10   in the letter that he was very disturbed by something that he

11   kept hearing in the gallery that he was in about the conduct

12   of one of the other inmates, and -- not only telling about

13   things that he had done but telling about things that he

14   planned to do.  And so my associate went out to see him and

15   talk to him more about it to get some details, and then I

16   contacted Ms. Lamarque about bringing him in to talk to the

17   authorities.

18           He didn't write me a letter and say can I get credit

19   for this, can I get a 5K, whatever that is.  He didn't say

20   that.  He contacted me because he was genuinely disturbed

21   about what he was hearing.  And he did cooperate with the

22   government.

23           And when the agents came to his house, he cooperated.

24   He gave them his passwords, he let them into the computer.  He

25   gave a statement regardless of whether we have a dispute about

USA v Huzinec - Sentencing - 2/15/18

1    some parts of it that were said or not, he gave a statement to

2    them.  He, I think in a certain sense, was actually relieved

3    when it happened, although he was at the point where he knew

4    he was coming apart and that he had to deal with issues in his

5    earlier life as well as what was going on here, and had made

6    some efforts to try and start that process, he still -- he

7    still -- he was glad that this -- that he knew that this had

8    stopped.

9         Judge, in -- with respect to the things that have

10   been said about the child pornography that he has received,

11   there's no question about the fact that it is some really,

12   really bad stuff.  There's no question about that.  But he,

13   like many others who get caught up in this, if caught up is a

14   right word, once they join this peer-to-peer website, stuff

15   comes in regardless of what you ask for.  And he told the

16   agents when it came there was something bad in the program

17   that he had that this stuff just kept coming, and it would

18   crash his computer and he would have to shut it down.  But

19   they make reference to something like 2,000 entries or images

20   or something that was there, and he said -- he's told me the

21   most that he's opened is probably ten to 15 so he doesn't even

22   know what most of it is.  He said he never saw the things that

23   are described here.  That doesn't -- that doesn't absolve him

24   from this, he's still got the vile stuff on his computer which

25   he acknowledges that it's wrong and he didn't delete it from

1   his computer.  So that's wrong.

2        But I want the Court just to take that into

3   consideration that this is not something that he is out there

4   searching for the things that have been described here.

5        And, Judge, also, he got the two images that we've

6   talked about, the one where he took the photograph and the

7   other where he had the boy send a photograph to him.  But some

8   measure, I think, of comfort that he -- he never distributed

9   it to anybody.  Obviously, he shouldn't have had it, shouldn't

10  have done it, but he never distributed it.  He never sent that

11  around, there's no proof whatsoever.

12       And that this behavior has happened over a relatively

13  short period.  Now, I don't know whether it would have

14  continued or not.  I don't know.  I don't know if he would

15  have been able to get help if it could have stopped right

16  then, I don't know, you don't know, and none of us will ever

17  know.

18       And I also know that you're concerned about the

19  future and concerned about the protection of the public

20  because of the nature of these activities.  But -- but I think

21  it's important for you to consider the fact that this is not

22  some long-term thing that's gone on for years and years.

23       And Ms. Lamarque just -- she made a comment about

24  some of the letters that were written and, you know, used the

25  words mistake and immaturity and that.

1      I've spent, I don't know how long Judge Arcara's been

2   a judge, 30, 40 years or something like that, I spent all that

3   time listening to him go ballistic about people using the word

4   mistake, and I understand where he's coming from.  But you

5   have regular, ordinary citizens, and they describe things that

6   are bad and they call it a mistake.  There's no intent there

7   to try and minimize that.  What they're trying to get the

8   Court to understand is that they believe that there's good in

9   Daniel and that that's what they know about him.  And when

10  they look at something that he has done, they consider it a

11  mistake, even though it was an intentional act.

12      I mentioned, Judge, that him having a position in the

13  Boy Scouts and at Child and Family Services was not ideal for

14  him.  And Dr. Mazur has obviously looked at that and confirmed

15  that, and this Court or any other court or probation

16  department is never going to let him work in any kind of a

17  position like that regardless of whether he has treatment and

18  becomes much, much better, no one is going to take that

19  chance.  But that was a very important part of his life.  And

20  he did enormous good in that.

21      He did enormous good with respect to the Boy Scout

22  troop he mentored, he tutored all sorts of children, none of

23  whom have made any claims or allegations of him doing anything

24  to them because it didn't happen.

25      In the Child and Family Services, he had been

 1   promoted.  So at Child and Family Services at the time this

 2   happened, he was working in their adoption section, he wasn't

 3   even with children.  If he was trying to use his job to do

 4   this kind of behavior, he certainly wouldn't have wanted to go

 5   to a different job where he didn't have access to children.

 6          Judge, Dr. Mazur talks about the counseling that

 7   Daniel needs for a number of things: this case, this behavior,

 8   things that have happened to him in his past, things that he

 9   has never really come to terms with.

10          And it's unfortunate, and I'm not blaming anybody for

11   it, but he's now been in custody for three years and obviously

12   there's been no counseling or therapy.  He has some small

13   measure of it by meeting with Dr. Mazur a number of times

14   where Dr. Mazur could make suggestions to him, he's met with

15   me, met with my associates, and we try to help him.  And he

16   does -- he's a very smart young man, and he was studying

17   psychology.  And he looks inside of himself, and he has made

18   some progress himself in certainly coming to terms with the

19   things that happened to him in his life and the things that he

20   has done.  And, so, and that's a good thing.

21          But, now, he's going to face another additional

22   period of time in custody.  No matter what you decide, it's

23   going to be a significant amount of time that he's going to go

24   on and he's still not going to get any therapy or help, and

25   he's somebody that really needs it.  And that's unfortunately

1   just a function of the system that we have right now that

2   that's not available or can be done.

3           But one of the things that I mentioned in my

4   presentence report is, Judge, I've been doing these cases

5   with -- not just child porn, but child sex abuse and all sorts

6   of things for many, many years, and I know all of the agencies

7   around here, and there are some that are okay and there are

8   some that are awful, and my only request to the Court would be

9   to consider in your sentence directing that when he is

10  released from custody that an evaluation be done and the right

11  place be found for him to go.

12          And I understand there are restraints on the

13  probation department in who they have contracts with and who

14  they can send, but there are agencies around and facilities

15  around that I think he could really benefit from if he goes to

16  the right one.  And if he goes to the wrong one, I think it

17  would be really significantly harmful for him.

18          Judge, the plea agreement provides that we can argue

19  for a sentence outside the guidelines, and I'm doing that.

20  And I will not bore the Court, and I'm sure you will probably

21  throw me out of here if I gave you my opinion of the

22  sentencing guidelines, but they are draconian for many types

23  of offenses and the sentencing schemes are draconian for many

24  type of sentences.

25          And Daniel Huzinec needs to be punished, there's no

1   question about that.  He does not need to be punished in the

2   way that the sentencing guidelines recommend.

3          I'd ask the Court to take his whole life into

4   account, the things that he has suffered not because

5   they excuse what it is that he did, I don't say that at all.

6          In a death penalty case, Judge, aggravating factors

7   or mitigating factors, and the prosecutors always want to say

8   well, if the mitigating factors don't explain away what you

9   did in the crime, then they're not mitigating factors.

10  Mitigating factors are anything that you can bring to the

11  attention of the Court that may cause the Court or a jury to

12  grant some mercy or say there's some reason that I should do

13  something less than what the absolute of the law or the

14  guidelines require.  And in this particular case, there are

15  many, many good things in his life, including the support

16  system that you've read about and know about from the people

17  that are here that can help him in the future.

18          And I think with the recognition that he has of his

19  problems and if he gets the right kind of help, I think that

20  any danger that he is to anybody else is really minimal.

21          And Dr. Mazur confirms that, that he is not somebody

22  that's up on a high scale of somebody who he thinks is going

23  to be a re-offender.

24          THE COURT:  Mr. Huzinec, is there anything else you

25  would like to say?

1         THE DEFENDANT:  Yes.

2         They say the difference between shame and regret is

3    that shame is feeling bad about one's self where regret is

4    feeling bad about one's behavior.  I have experienced both.

5         There is no easy way to deal with hurting others.

6    The words I say may sound hollow when I truly am the most

7    sincere I've ever been in my life.  I cannot control how these

8    words will be received, but I need to say them.

9         I've hurt many people, some here today and some not.

10   I've hurt people that I care about by my reckless and immature

11   decisions and actions.  There is no way to measure how much

12   pain I've caused.

13        I caused terrible damage to the lives of my two

14   victims and their families.  I was supposed to be a friend and

15   a mentor and a big brother and lead by example.  I broke their

16   trust and betrayed their faith in me.  I caused harm to

17   children whose purpose I had.  I caused much public

18   embarrassment to the scouts and my workplace.  I caused great

19   pain to people who trusted me, and I caused shame to my family

20   and friends.

21        I want to say directly in no uncertain terms that I'm

22   sorry, sorry for everything, all of the pain I caused and the

23   damage I've done.

24        I hope these words can even in the smallest way -- or

25   I'm sorry.  I hope these words can help even in the smallest

```
 1   way.

 2          I understand and accept that my words will not be

 3   accepted, that my apology to my victims and everyone else may

 4   sound insincere, and I do not accept my apology to be

 5   accepted.  But I do apologize.  I do -- I do mean it.

 6          I am plagued by feelings of regret, remorse and

 7   thoughts of my two victims' wellbeing and the children in the

 8   pictures.  In a way, my English is good because I should feel

 9   this way and suffer for what I've done.

10          My aspirations in life were never grand.  I never

11   dreamed of being famous or rich.  My goals were much simpler,

12   I wanted to help people.  I wanted to be the best leader that

13   I could for my scouts, help them in every way I knew how,

14   encourage them to be the best people that they could be.

15          My work, as hard as it was, I did not consider work.

16   I can honestly say that I would not trade my years working in

17   mental health or my life in community service for anything

18   else or any other lifestyle.  Those things made me truly happy

19   and helped people along the way.

20          I wanted to get -- further get a degree in psychology

21   to do even better things for others.  Now I've failed myself

22   and failed those that love me and failed everyone else that I

23   know.

24          I had high expectations for a good life of service to

25   others, and I have crossed a dark line and will never escape
```

1   the consequences.

2          I have learned a lot about myself in the last three

3   years.  I know there are many things that I have to address

4   and that I need professional help.  Dr. Mazur has helped me

5   see that -- that I needed help a long time ago.  I want to get

6   the help that I need so that I will never be a danger or

7   threat to anyone other person for the rest of my life.

8          Your Honor, I understand the need to give the victims

9   and the community justice for my actions, and I know you will.

10  I know that is what you will do.  If you can find anything in

11  me that warrants mercy, I ask for it.  If you do not find

12  anything, I understand and will accept whatever you believe is

13  right.

14         I thank all my family and friends and loved ones who

15  have come to lend me their strength today, and I thank all

16  those would have stuck with me when I did not believe I was

17  worthy of their support.

18         As I said, the words I'm sorry are not enough.  They

19  sound hollow to me, but I know that and I say them anyway

20  because they're all I can say.  I'm sorry.

21         Thank you for listening to me and reading my letter,

22  too.  Thank you.

23         THE COURT:  Okay.  We're going to take a break, and I

24  apologize to the folks who are here for the 11:00.  This has

25  gone a bit longer than we had expected, and I apologize for

1   that, but I do need a little time to digest what everybody has

2   said to me in the last few minutes, and so I want to take

3   about a ten-minute break.  I'll be back about 20 after 11.

4   Okay?  Thanks.

5          THE CLERK:  All rise.

6          (Off the record at 11:12 a.m.)

7          (Back on the record at 11:22 a.m.)

8          THE CLERK:  All rise.

9          THE COURT:  Please be seated.  Do either counsel know

10  of any reason why sentence should not now being imposed?

11         MS. LAMARQUE:  No, Your Honor.

12         MR. HARRINGTON:  No, sir.

13         THE COURT:  Pursuant to the Sentencing Reform Act of

14  1984 and the 2016 version of the sentencing guidelines, it is

15  the judgment of the Court that the defendant, Daniel Huzinec,

16  is hereby sentenced to 168 months of imprisonment.  The cost

17  of incarceration fee is waived.

18         I recommend that the Bureau of Prisons incarcerate

19  Mr. Huzinec in a facility that can provide counselling to him

20  specifically, if possible, sex offender/sexual abuse victim

21  counseling, that he be housed in a facility as close to

22  Western New York as possible so that family members will have

23  access to him.

24         Upon release, the defendant shall be placed on

25  supervised release for life.  After his release, the following

1   conditions shall apply:

2           Within 72 hours of release from custody of the Bureau

3   of Prisons, the defendant shall report in person to the

4   probation office in the district where he is released unless

5   the probation officer instructs him differently.

6           The defendant shall comply with the standard

7   conditions of supervised release that are adopted by this

8   Court.

9           The defendant shall not commit any crimes under

10  federal, state or local law.

11          The defendant shall not possess a firearm or any

12  other dangerous device.

13          The defendant shall not possess a controlled

14  substance except as prescribed by a physician.

15          Because the offense occurred after September 13th,

16  1994 and is not related to illegal substances and because the

17  defendant does not have a history of substance abuse problems,

18  the mandatory requirement for drug testing is waived.

19          The defendant shall cooperate in the collection of a

20  DNA sample as required by the Justice for All Act of 2004.

21          Because the offense involved the use of a computer

22  and child pornography, the defendant shall not use or possess

23  any computer, data-storage device or any internet-capable

24  device unless the defendant participates in the computer and

25  internet monitoring program, or unless authorized by the Court

1    or the United States Probation Office.

2          The defendant must provide the probation office

3    advanced notification of any computers, automated services or

4    connected devices that will be used during the term of

5    supervision.  The United States Probation Office is authorized

6    to install any application as necessary to surveil all

7    activity on computers or connected devices owned or used by

8    the defendant.  The defendant will be required to pay the cost

9    of monitoring services.

10         The United States Probation Office shall be notified

11   via electric transmission of impermissible, suspicious

12   activity or communications occurring on such computer or

13   connected device consistent with the computer monitor policy

14   in effect or the practice currently used by and therefore the

15   de facto policy of the probation office.

16         As triggered by impermissible, suspicious activity

17   and based on reasonable suspicion, the defendant shall consent

18   to and cooperate with unannounced examinations of any computer

19   equipment owned or used by the defendant.  The examination

20   shall not include -- shall include but is not limited to

21   retrieval and copying of all data from the computers,

22   connected devices, storage media, and any internal or external

23   peripherals and may involve removal of such equipment for the

24   purpose of conducting a more thorough inspection.  Any such

25   monitoring or examinations shall be designed to avoid as much

1    as possible reading any privileged information or any private

2    material that is not illegal or reasonably likely to lead to

3    illegal material or evidence related to illegal material.

4            Because the offense involved child pornography, the

5    defendant must participate in a sex offense specific treatment

6    program and follow the rules and regulations of that program.

7    The probation officer will supervise the details of the

8    defendant's participation in the program including the

9    selection of a provider and schedule.  If inpatient treatment

10   is recommended, however, Court approval must be obtained

11   unless the defendant consents.  The defendant is not to leave

12   treatment until complete or as ordered by the Court.  The

13   defendant is required to contribute to the cost of services

14   rendered.

15           Because the offense and relevant conduct involve

16   child pornography including production, the defendant shall

17   not have any deliberate contact with any child under 18 years

18   of age, excluding his biological or adopted children, unless

19   approved by the probation officer or by the Court.

20           The defendant shall not loiter within 100 feet of

21   schoolyards, playgrounds, arcades, or other places primarily

22   used by children under the age of 18.

23           The probation office has the discretion to authorize

24   the defendant to pick up his own children from school or other

25   functions.  However, authorization must be obtained in advance

1   from the probation office or, alternatively, from the Court.

2          In order to monitor the defendant's compliance with

3   not buying or subscribing to online services that provide

4   child pornography, the defendant shall provide the United

5   States Probation Office with access to any requested personal

6   and/or business financial information.

7          Because registration as a sex offender is required

8   and contemplated by the plea agreement, the defendant shall

9   register with the state sex offender registration agency in

10  any state where the defendant resides, is employed, carries on

11  a vocation, or is a student, and shall provide proof of

12  registration to the probation office.

13         The probation office is authorized to release the

14  defendant's presentence report to the New York State Board of

15  Examiners of Sex Offenders.  Further disclosure to the county

16  court and to parties involved in the determination of the

17  defendant's final classification level is also authorized.

18         The defendant shall submit to a search of his person,

19  property, vehicle, place of residence, or any other property

20  under his control based on reasonable suspicion and shall

21  permit confiscation of any evidence or contraband discovered.

22         In order to monitor the defendant's compliance with

23  other conditions of supervised release that I've just stated,

24  the defendant shall submit to polygraph, computerized voice

25  stress analyzer or other such testing not to exceed twice in a

1    calendar year, and an additional two retests per year as

2    needed.  That testing may include examinations using a

3    polygraph, computerized voice stress analyzer, or other

4    similar device to obtain information necessary for

5    supervision, case monitoring and treatment.

6         The defendant shall answer the questions posed during

7    the examination subject to the defendant's right to challenge

8    in a court of law the use of such statements as violations of

9    the defendant's Fifth Amendment rights.  In this regard, the

10   defendant shall be deemed not to have waived the defendant's

11   Fifth Amendment rights by making any such statements.  The

12   results of any polygraph pretests and polygraph examinations

13   may be disclosed to the United States Probation Office and the

14   Court, but shall not be further disclosed without a Court

15   order.  The defendant is required to contribute to the cost of

16   services rendered.

17        The defendant shall pay to the United States a

18   mandatory special assessment of $100 that's due immediately,

19   payment shall be made to the Clerk, United States District

20   Court, Attention Finance, United States Courthouse, 2 Niagara

21   Square, Buffalo, New York  14202.

22        If the special assessment is not paid when he's

23   incarcerated, payment of the special assessment shall begin

24   under the Bureau of Prisons Inmate Financial Responsibility

25   Program.

1          So in determining the sentence, I've carefully

2     reviewed the circumstances of the case and the defendant's

3     plea.  I've read everything more than once that was submitted

4     to me.  I began my analysis with the guidelines.  I've

5     considered the arguments by both sides as to what an

6     appropriate sentence would be here.  And I've also considered

7     the factors in 18, United States Code, Section 3553(a) which I

8     stated earlier and I'm not going to repeat.

9          I'm not imposing a fine.  I'm not imposing the costs

10     of supervised release because I don't think you have the

11     financial ability to make the payments.  But I've imposed the

12     sentence that I have for a few reasons.

13          The receipt of the child pornography, having child

14     pornography on your computer, is a serious crime that affects

15     and ruins people's lives, it ruins the lives of young people,

16     babies, and that's especially when it involves the kind of

17     material that was found on your computer here.

18          And as Ms. Lamarque points out, there were babies in

19     diapers, a five-year-old female, three-year-old female,

20     two-year-old male, a six-month-old baby, they're all in the

21     chart on page 7 of the presentence report.  And I won't get

22     into the description of what the videos say or what the

23     summary of the videos are because it's just too awful to say

24     out loud.

25          People who receive and possess these things, people

1   who get involved in these sharing arrangements, create a

2   market for this stuff and victimize those babies over and over

3   again as they grow into children and into young adults and

4   into adults and it results in lives that are destroyed.

5           Here, your conduct went a step beyond that, and it

6   involved personally victimizing minors that you knew.

7           You posed as a teenage girl to get a teenage boy to

8   send you pictures of himself, inappropriate sexual pictures of

9   himself.  And then you encouraged the boy, who evidently you

10  were a mentor to or at least an advisor to, you encouraged him

11  to send those pictures to who he thought was an

12  age-appropriate girl who was interested in seeing them, but it

13  turned out to be you.

14          The level of deceit toward a young boy that you knew

15  and who apparently looked up to you and for advice, it just --

16  it's beyond my comprehension.

17          And then you touched a young boy inappropriately as

18  he slept on a scouting trip where you were an assistant

19  scoutmaster and you took pictures of that young boy for your

20  own pleasure later on.  That's troubling.  That's God awful.

21          And let me say this: I don't think you're a bad

22  person.  I don't think you're a bad person.  I think you're a

23  good person, and the letters speak to that, who did some very,

24  very, very, very bad things.

25          So I don't think this says anything about, as

1    Mr. Harrington says, you've done a lot of good things in your

2    life and you deserve credit for them, and I've weighed that

3    into the calculus when I decided on the sentence that I did.

4    But I don't want you to think that what I -- what I'm saying

5    is about the acts that you committed, not about who you are

6    because I think that you're a good person who did some very

7    bad things.

8            And, but even worse than everything I've said so far,

9    I think, is that you set yourself up for this because you knew

10   your attractions and your proclivities, and you still involved

11   yourself as an adult with the Boy Scouts and you took a job at

12   Child and Family Services.  And you probably were good at the

13   job that you did, but you surrounded yourself with temptation.

14   And when you succumbed to the temptation, that shouldn't have

15   been a surprise to yourself because you were surrounding

16   yourself with kids.  That's a conscious choice on your part,

17   and it led to your standing in front of me today.

18           The opportunities that resulted from that culminated

19   in the offenses that you committed and, you know, and based on

20   supervising scouts on the camping trip, and a young man who

21   was looking up to you.

22           So these are serious crimes, and the fact that your

23   lawyer is as good as he is and negotiated a plea that spared

24   you the 15 year mandatory minimum sentence that would have

25   applied if you had pled guilty to the production counts is the

1    only reason that you didn't get the mandatory minimum.

2            And the only -- and his eloquent words this morning

3    and the letters are the reason that I didn't impose a sentence

4    toward the higher end of the guidelines.  I imposed the low

5    end of the guidelines.

6            So I think the nature and circumstances of the

7    offense, the need for the sentence to reflect the seriousness

8    of the offense, to promote respect for the law and to provide

9    a fair punishment to you, the need to deter others and to

10   protect the public from your crimes and the interest of

11   consistency in sentencing all counsel for a sentence within

12   the guidelines range.

13           I chose the low end of the guidelines for a few

14   reasons.  First of all, I recognize your prior history and

15   what happened to you when you were a young person, and I think

16   that that probably explains some of your acts.  It certainly

17   doesn't excuse it.  There are lots of people who suffer at the

18   hands of other people who don't commit acts like this, but I

19   think that is something of an explanation.

20           I think that the letters that were written on your

21   behalf speak to the goodness in you.  And I think, as I said

22   earlier, there's a lot of goodness in you.  And so that led me

23   to the low end of the guidelines.

24           And then I think your acceptance of responsibility

25   and the remorse that you have that I think I saw in you this

1    morning when you spoke and that I certainly read in your

2    letter and read in the letters of the others who wrote on your

3    behalf led me to impose a sentence at the very low end of the

4    guidelines.

5              You're a young man, and you're going to be a young

6    man when you're going to be released from prison.  You've got

7    a long life ahead of you, and you can do a lot of good with

8    that life.  You can change things and lead a life on the

9    straight and narrow.

10             And I hope you get the counselling, and -- because I

11   do think you need counseling.  I think Dr. Mazur acknowledges

12   that you need counseling in order to function in society.  And

13   I hope you get the counselling.  I know you have the support

14   from your family because there's so many people here who

15   obviously care an awful lot about you, so you've got the

16   support mechanisms in place to succeed.

17             I hope the counseling gives you the ability to

18   succeed, and I think you can do it.  And as I say, you've got

19   a long life ahead of you.  You're going to have a lot of years

20   after you're out, and I hope that you use those years very

21   productively.

22             So, based on the sentencing guidelines, based on

23   everything that was presented to me, based on my consideration

24   of all the facts and circumstances of the case, I think the

25   sentence imposed is sufficient but not greater than necessary

1    to comply with the purposes of sentencing in 18, United States

2    Code, Section 3553(a)(2).

3           And I've imposed a lifetime term of supervised

4    release with special conditions, Mr. Huzinec, because the

5    special conditions are obviously designed to help you return

6    to society after your incarceration.  And the lifetime

7    monitoring is there because I want to be sure that this

8    doesn't happen again, and I want -- I want you to understand

9    that if there's any actions that even approach what happened

10   that the probation office is going to find out and it will be

11   presented to a judge, perhaps not me, but to a judge who can

12   then decide what needs to happen based on that.

13          So, pursuant to Rule 32(j)(1)(B) of the Federal Rules

14   of Criminal Procedure, I now advise you of your right to

15   appeal.

16          You have a statutory right to appeal your sentence

17   under certain circumstances, particularly if you think the

18   sentence is contrary to law.  The defendant may waive those

19   rights as part of a plea agreement.

20          As I think you recognize, you entered into a plea

21   agreement in which you waived some of your rights to appeal,

22   specifically your right to appeal a sentence that falls within

23   or is less than the calculated guidelines range of

24   imprisonment which this sentence is.  Waivers like these are

25   generally enforceable, but if you think the waiver is

1    unenforceable for some reason, you can present that theory to

2    an appellate court.

3           If you want to attempt to appeal some issue that you

4    believe survives your waiver, you must file a notice of appeal

5    within 14 days.

6           If you're unable to pay for the cost of appeal, you

7    may apply for leave to appeal in forma pauperis, that means

8    leave to appeal without paying costs.

9           And you have the right to be represented by counsel

10   in any appeal.  If you can't afford counsel, you have the

11   right to have counsel appointed to represent you.

12          Ms. Lamarque, do you have a motion?

13          MS. LAMARQUE:  Yes, Your Honor.  The government moves

14   to dismiss Counts 1, 3, 4 and 5 of the superseding indictment.

15          THE COURT:  And that motion is granted.

16          And I also need to issue a final order of forfeiture;

17   is that right?

18          MS. LAMARQUE:  Yes, Your Honor.  I will submit that.

19          THE COURT:  Terrific.

20          MS. LAMARQUE:  Thank you.

21          THE COURT:  Statement of reasons shall be included in

22   the judgement and shall be provided to the probation office,

23   the Sentencing Commission and the Bureau of Prisons.

24          A complete copy of the presentence report shall be

25   provided to the probation office, the Sentencing Commission

1    and to the Bureau of Prisons.

2            Any other copies of the report and related materials

3    shall remain confidential.

4            If an appeal is taken, counsel on appeal will have

5    access to the report except for the recommendations section at

6    the end of the report.

7            A judgement of the conviction should be prepared

8    promptly on the form prescribed for judgments, including

9    sentences under the Sentencing Reform Act.

10           The defendant is remanded to the custody of the

11   United States marshals.

12           Is there anything further from the government?

13           MS. LAMARQUE:  No, Your Honor.

14           THE COURT:  Anything further from the defense?

15           MR. HARRINGTON:  No.

16           THE COURT:  Okay.  Thank you all very much.

17           MS. LAMARQUE:  Thank you.

18           (Proceeding concluded at 11:40 a.m.)

19               *     *     *     *     *     *     *

20

21

22

23

24

25

1                        CERTIFICATION

2

3            I certify that the foregoing is a

4       correct transcription of the proceedings

5       recorded by me in this matter.

6

7

8

9                     s/ Ann M. Sawyer
                      _____
                      Ann M. Sawyer, RPR, CRR, NYRCR, NYACR
10                    Official Reporter
                      U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25